BIMS *v.* COLLIER.

Opinion delivered April 20, 1901.

1. WITNESS—IMPEACHMENT.—It was not improper to refuse to permit a witness, an attorney, to be questioned whether he had not been disbarred, as he might have been disbarred for conduct that would not affect his credibility as a witness. (Page 249.)

2. SAME.—Where an attesting witness testified that the testator was of sound and disposing mind, it was error to refuse to permit him to be asked if he did not say that he would not have signed the affidavit annexed to the will if he had known that the words "of sound and disposing mind and memory" were in it. (Page 249.)

3. SANITY—BURDEN OF PROOF.—An instruction that the burden of proof upon the issue of the sanity of testator at the time of making the will is upon the contestants, and they must establish by a preponderance of the evidence, with reasonable certainty, that at

the time of making said will the testator was insane, or the will must be taken as valid, and that if there was only a mere balance of evidence, or a mere doubt only of the testator's sanity, the presumption is in favor of sanity, was erroneous, as tending to induce the jury to believe that it was not sufficient to prove defendant's insanity by a bare preponderance of the evidence. (Page 249.)

Appeal from Jefferson Circuit Court.

A. B. GRACE, Judge.

*Austin & Taylor,* for appellants.

It was competent for appellants to ask witness Anthony questions tending to impeach his character. Steph. Dig. Ev. art. 129; 53 Ark. 391; 42 N. Y. 270. The court erred in its instruction as to the burden and degree of proof of insanity. 52 Ark. 517; 37 Ark. 589.

*White & Altheimer,* for appellee.

There was no error in the court's instruction as to the burden and degree of proof. Sack. Inst. to Juries, p. 592, § 7; Jarm. Wills, 104; Redf. Wills, 31-50; 39 N. H. 163; 36 Ind. 129; 42 Ill. 376; 11 Ga. 337; 12 Ia. 491; 45 Atl. 378. There was no error in the instruction of the court as to mental capacity of the testator. 49 Ark. 372; 64 Ark. 351; 29 Pa. 298; 6 L. R. A. 167-8; 36 *id.* 725; 2 *id.* 668. The court properly excluded the question to witness Anthony.

BATTLE, J. In February, 1891, Dawson Nance died at his late residence in Jefferson county, in this state, leaving Fannie Bims and Bertha Trulock, his children and only heirs, and a widow, who was the step-mother of his children, him surviving; his widow having since died. After his death an instrument of writing purporting to be his last will and testament was presented to the Jefferson probate court for probate. Fannie Bims and Bertha Trulock objected on the ground that the deceased was not of sound and disposing mind, memory and understanding at the time of its execution. The will was admitted to probate, and the contestants appealed to the Jefferson circuit court; and upon a trial there as to the validity of the will the issue was decided against the contestants, and the writing was adjudged to be the will of Dawson Nance, and from this judgment an appeal has been taken.

In the trial in the circuit court, which was before a jury, F. B. Anthony testified, substantially, as follows: He was a real

estate agent, notary public, and lawyer. In 1890 or 1891, about eight or nine years before the time he was testifying—the 11th day of May, 1899—he wrote the will of Dawson Nance, at his request. At this time Nance was confined to his bed, and was very sick. Witness talked to him about an hour, and ascertained what disposition he desired to make of his property, and wrote the will accordingly. Nance seemed to be in his right mind. He signed the will by making his mark, and J. Flagg, Jas. C. Havis, and witness attested it as subscribing witnesses. Witness in the course of his examination was asked if he was not suspended from the practice of law on account of unprofessional conduct, and the court would not permit him to answer the question, and contestants excepted.

The will and the affidavits of Anthony and Havis, as subscribing witnesses, were read as evidence. In the affidavits the affiants stated that Nance at the time he executed the will was "of sound and disposing mind and memory."

Havis testified as follows: He was requested to attest the will. Before signing some one asked Nance, "Is this your sentiments?" or something to that effect, and he said, "Yes; and I want this plan carried out." "He bowed, and nodded his head, and I understood that to mean yes— that was the substance by the nod of the head." In the course of his examination, contestants asked him if at a certain time and place, before certain persons, he did not say that he would not have signed the affidavit annexed to the will if he had known that the words, "and of sound and disposng mind and memory" were in it, and the court refused to permit him to answer, and the contestants excepted.

Flagg testified: He was requested to go to the residence of Dawson Nance, and witness his will. He went, and when he arrived there he found Nance's room crowded. He pushed his way to Nance's bedside, and asked him how he felt, "and he asked me what I was doing there," and said, "I want you all to go home and not bother me." Anthony read the will to witness, and asked him to sign it, which he did. When witness spoke to Nance he was quiet, but as soon as witness spoke he became restless and noisy, and used obscene language in the presence of women, and was noisy the whole time Anthony was reading the will. Witness was the first to attest the will. When he was well, Nance did not act as he did when his will was attested, and was a very good old man— very civil and gentlemanly. Witness does not think he was of sound mind when he executed the will.

J. W. Davis testified: "I was at the residence of Dawson Nance when S. B. Anthony wrote his will, and when it was executed and attested." "While Anthony was there writing out that will, he spoke some vulgar words in his rage, and was trying to get out of bed; and we had to wait on him every now and then, until his right mind came to him, so he could tell us what he wanted to say. He would throw the cover, and want to get out of the bed, and we would hold him, and keep him quiet until he could speak what he wanted us to do for him about his home." "He was flighty." "He was not of a sound mind. None of us that was in the room—we all agreed that he was nôt of his sound mind. Even Anthony himself said he was not in his sound mind." Anthony got the facts stated in the will from Nance. "When he [Nance] was having his will made out, he would take them spells that way, and we would have to wait and let him rest, and go to him and rouse him up, and ask him what he wanted to say, and what must Anthony do. Anthony would ask him, 'Do you want me to put in the will so and so?' and of course he would say 'Yes.' And he would go off and write a while, and say 'Do you want me to put it in this way?' Anthony asked him to make me executor, and he said, 'Yes.'"

Fannie Bims testified: "Dawson Nance was my father. When Anthony was writing his will, and father executed it, he (father) was talking a great deal or random talk, and it was a very hard matter to keep him still; and he was always trying to show you something around and about the house, and in the window, and by the door. He was always trying to show Mrs. Johnson and Mrs. Havis. He would say, 'Look at such and such a thing;' would not call any particular name, and would get kind o' quiet; and Mr. Davis asked him what was the matter with him, and he would worry and want to get up, and we would not let him get up. He did not act like a man of sound mind."

Florence Collier testified: "I was at Dawson Nance's house when Anthony wrote his will. He told Anthony how he wanted the will written, and seemed to have a good mind, and knew what he was talking about. I thought he was acting like he was in his good mind. He would act—We asked him did he know what he was doing. I remember asking him once, and he says, 'Yes, I know what I am doing.' I asked him this question because he would act funny to me."

Upon this evidence, over the objections of the contestants, the court instructed the jury, in part, as follows:

"First. The jury are instructed that the burden of proof upon the issue of the soundness of mind or sanity of Dawson Nance at the time of the making of the will is upon the contestants of the same, and they must establish by a preponderance of the evidence, with reasonable certainty, that at the time of the making of said will the said Dawson Nance was insane or of unsound mind, as explained in these instructions, or the will must be taken as valid. If there is only a bare balance of evidence, or a mere doubt only of the sanity of the testator, the presumption is in favor of sanity."

Did the court err in excluding evidence? It did not err in refusing to permit Anthony to answer the question in which he was asked if he had not been suspended from the practice of law. The question was obviously asked for the purpose of impeaching the testimony of Anthony. An affirmative answer to the question would not have had that effect, because he could have been suspended for ungentlemanly conduct which could not have affected his credibility.

The court erred in refusing to allow Havis to answer the question propounded to him in which he was asked, if he did not say that he would not have signed the affidavit made by him and annexed to the will of Nance if he had known that the words, "and of sound and disposing mind and memory" were in it. These words were in the affidavit which was read as evidence to the jury. The question, evidently, was asked for the purpose of impeaching the testimony of Havis. An affirmative answer to the question, or evidence that he made the statement about which he was asked, would have shown that he was of no fixed opinion as to the sanity of Nance, and would have tended in that way to weaken the testimony of Havis, and for that purpose was admissible.

Should the instruction have been given? In *McCulloch* v. *Campbell*, 49 Ark. 373, Mr. Justice Smith, in delivering the opinion of the court, said: "There is some confusion in the reported cases on the adjustment of the burden of proof of insanity in will contests. But we think the weight of authority, both in England and in this country, establishes the rule that the production of a proper writing purporting to be the will of a deceased person, which is rational on its face, and which is proved to have been executed and witnessed in accordance with the statute, makes a *prima facie*

case, and devolves upon the contestants the *onus* of showing the testator's incompetency. This rule rests upon the presumption that all men are sane until the contrary is proved."

Mr. Schouler in his work on the law of Wills, says: "All or most of our decisions agree, in substance, that, whether as a legal presumption or as a presumption of fact or mixed presumption, amounting only to a *prima facie* case, there exists, upon proof that the will, a natural one on its face, was duly executed by an adult not otherwise incompetent, a presumption in favor of the testator's sanity, which they who impeach the will are bound at this stage to overcome. And the larger and better class of American authorities point, moreover, to the conclusion that the court or jury trying the case must, upon the whole evidence, be satisfied that the testator was of sound mind; so that, if there be inevitable doubt left on this point from all the testimony, the will cannot be considered as proved." Schouler, Wills, § 174.

We do not think that the presumption of sanity in a case in which a will is contested has any greater force than any other rebuttable or disputable presumption of law has in any ordinary civil case. When such presumptions are overcome by evidence, the conflicting evidence on the question of fact is to be weighed, and a verdict rendered in favor of the party whose proofs have most weight; and the presumption is of value only as it has probative force, "except it be that on the entire case the evidence is equally balanced, in which event the arbitrary power of the presumption of law will settle the issue in favor of the proponent of the presumption." In *Graves* v. *Colwell*, 90 Ill. 616, it is said: "It has been said that presumptions of law derive their force from jurisprudence, and not from logic, and that such presumptions are arbitrary in their application. This is true of irrebuttable presumptions, and, primarily, of such as are rebuttable. It is true of the latter until the presumption has been overcome by proofs, and the burden shifted; but when this has been done, then the conflicting evidence on the question of fact is to be weighed, and the verdict rendered, in civil cases, in favor of the party whose proofs have most weight, and in this latter process the presumption of law loses all that it had of mere arbitrary power, and must necessarily be regarded only from the standpoint of logic and reason, and valued and given effect only as it has evidential character. Primarily, the rebuttable legal presumption affects only the burden of proof, but if that burden is shifted back upon the party from whom it

first lifted it, then the presumption is of value only as it has probative force, except it be that on the entire case the evidence is equally balanced, in which event the arbitrary power of the presumption of law would settle the issue in favor of the proponent of the presumption."

It follows, therefore, according to the general rules of evidence, that whenever the preponderance of evidence proves that a testator at the time of the execution of a will was of unsound mind, memory and understanding, the presumption of sanity loses its arbitrary force, and the verdict of the jury or decision of the court, as the case may be, should be in favor of the contestants.

Tested by the rule stated, the instruction copied in this opinion should not have been given. It was misleading, and was calculated to induce the jury to believe that a bare preponderance of the evidence showing the insanity of Nance was not sufficient to defeat his alleged will, and that in order to do so the contestants must prove that he was insane to the exclusion of all doubts, and that the presumption of sanity prevails, although a bare preponderance of the evidence was to the contrary. On account of the doubt in which the evidence leaves the sanity of Nance, it was prejudicial.

Reversed and remanded for a new trial.

HUGHES, J., (dissenting). It is a presumption of law that a person is not insane until it is overcome by proof. Sanity is a question of fact for the jury, under proper instructions by the court. The court committed no reversible error in its instructions. The verdict of the jury is not without evidence to support it. What Havis said in his affidavit proving the will, and what he had said previously to the contrary, was not material as it did not affect the issue in the case, which was only the sanity of the testator at the time of making his will.

It was not proper to show that witness Anthony had been disbarred from practicing law simply, without showing that he had been disbarred for some cause affecting his credibility as a witness. The court committed no error in not allowing the question, "Has your name been removed from the list of members of the Jefferson county bar?"

It is contended that the first instruction is erroneous, because it told the jury "that the burden of proof upon the issue of soundness of mind or sanity of Dawson Nance at the time of the making

of the will is upon the contestants of the same, and they must establish by a preponderance of the evidence, *with reasonable certainty* that at the time of making the will the said Dawson Nance was insane or of unsound mind, as explained in these instructions, or the will must be taken as valid."

"If there is only a bare balance of evidence, or a mere doubt only of the sanity of the testator, the presumption is in favor of sanity." By the expression "bare balance of evidence" is meant, if the testimony or evidence for and against sanity is evenly balanced, that is, if it is as much for as against sanity—the presumption of sanity turns the balance. There is nothing wrong in this. The expression "with reasonable certainty," in the connection in which it is used, only means that there must be reasonable certainty that the evidence preponderates in favor of the insanity of the testator's mind at the time of making the will.

I think the other instructions given clearly show the meaning of this instruction, and that the court committed no reversible error in giving it. I am of the opinion that no reversible error was committed, and that there was evidence to sustain the verdict of the jury; that the deceased made an equitable and just disposition of his small estate by will; and that the judgment of the court should be affirmed.